## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**J.D.**, a minor, by and through his next friend,
**JANE DOE**,
New Beginnings Youth Center
8400 River Road
Laurel, MD 20724,

                      *Plaintiff*,

v.

**THE DISTRICT OF COLUMBIA**,
a municipal corporation
1350 Pennsylvania Avenue, NW
Washington, DC 20004

**ANTHONY LLOYD**,
*In his individual capacity*
*c/o* P&G Behavioral Health Services
2218 Rhode Island Avenue, NE
Washington, DC 20018

**BERNELL DAVIS**,
*In his individual capacity*
849 Barnaby Street, SE
Washington, DC 20032,

                      *Defendants*.

Civil Action No.: _____

**Jury Trial Demanded**

## COMPLAINT FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, AND MONETARY DAMAGES

1.     The Department of Youth Rehabilitation Services ("DYRS") is responsible for caring for court-involved young people and giving them the "opportunity to become more productive citizens" in the "most homelike environment" possible.[1]  And yet, on May 5, 2022,

---

[1] D.C. Dep't of Youth Rehab. Servs., *About DYRS*, https://dyrs.dc.gov/node/1685381 (last visited Apr. 28, 2025).

Defendant Anthony Lloyd—a manager responsible for overseeing the treatment of children at DYRS—punched J.D.—a fourteen-year-old boy in DYRS custody—in the mouth with full force, fracturing J.D.'s jaw in two places.[2]  Defendant Lloyd's punch knocked J.D. down onto his bed. As J.D. lay on his mattress, blood pouring from his fractured jaw, Defendant Lloyd climbed on top of him, wrapped both hands around J.D.'s neck, and strangled him.  All the while, Defendant Bernell Davis—a DYRS supervisor—stood watching.

2.    In the minutes before Defendant Lloyd's brutal assault, J.D. had been sitting on the bed in his room.  J.D. was struggling with symptoms of depression and, before Defendant Lloyd punched him, repeatedly asked Defendant Lloyd and Defendant Davis to allow him to speak with a mental health professional.  Defendants Lloyd and Davis refused to help.  Instead of helping, Defendant Davis stood idly by as Defendant Lloyd punched and strangled J.D.

3.    J.D. survived the brutal attack.  But he was hospitalized for four days, had to undergo reconstructive surgery, and could not chew or engage in physical activity for six weeks. He missed school and the special education instruction to which he is entitled as a student with disabilities.  And he has experienced nightmares, difficulty sleeping, and feels constantly on-edge. Almost three years later, he still has pain in his jaw, and his jaw does not function properly.  J.D.'s jaw will never fully recover, and DYRS staff's actions have caused him lasting trauma.

4.    DYRS staff's actions have also deeply traumatized J.D.'s family.  J.D.'s mother believed that, while held by DYRS, her son would be safe and would receive necessary care.

---

[2] Plaintiff J.D. has filed a Motion for Leave to Proceed Pseudonymously simultaneously with this Complaint.  As that Motion explains, given the sensitive and private nature of the information in this Complaint, J.D.'s concerns about retaliation, and his status as a minor, he asks this Court to allow him and his next friend to pursue his claims pseudonymously.

Seeing her son's shattered and bloody face and knowing that her son would continue to be subject to staff's whims has caused J.D.'s mother extreme stress.

5.      Defendant Lloyd's assault, while horrifying, was not an anomaly.  Instead, J.D. understands that what happened to him is yet another example of DYRS's persistent practice of allowing staff to assault the young people in DYRS's care as punishment for perceived misbehavior.  Over the last several years, numerous incidents have surfaced in which DYRS staff have kicked, punched, or choked the children in their care; placed them in dangerous restraints; and crushed them by laying staff members' full body weight on top of them.

6.      Despite complaints, lawsuits, public reports, news articles, and public testimony about the pattern of staff assaults in DYRS facilities, the District has not taken steps to effectively fix the problem, as evidenced by the ongoing assaults.  By allowing this pattern to continue, the District is risking the lives and safety of the very children it has been charged with rehabilitating.

7.       J.D. is still committed to DYRS's custody and is being held at a DYRS facility.  He lives every day in fear that staff will again assault him and put his life in danger.  It is against this backdrop that he brings this action.

**JURISDICTION AND VENUE**

8.      J.D. brings this action under 42 U.S.C. § 1983, the Fifth and Eighth Amendments to the U.S. Constitution, and the laws of the District of Columbia.

9.      This Court has subject matter jurisdiction over the claims arising under federal law under 28 U.S.C. §§ 1331 and 1343, and over the claims arising under District of Columbia law under 28 U.S.C. § 1367.

10.     This Court has the authority to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201–2202 and Federal Rules of Civil Procedure 57 and 65.

11.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because all of the events giving rise to the claims took place in the District of Columbia.

**PARTIES**

12.     Plaintiff J.D. is a 17-year-old boy who is currently held at New Beginnings, a juvenile detention facility operated by DYRS.  In May of 2022, he was held at Youth Services Center ("YSC"), a juvenile detention facility also operated by DYRS.  He brings this action by and through his mother, Jane Doe, who is qualified to serve as his next friend and who will fully and actively advocate for his interests.

13.     Defendant District of Columbia ("the District") is a municipal corporation.  By and through its agents, the District of Columbia is responsible for the supervision and operation of DYRS, which operates a number of juvenile detention facilities, including YSC and New Beginnings.  The District is also responsible for and has a duty to establish policies and procedures for DYRS, including for the training, supervision, and discipline of DYRS staff.

14.     Defendant Anthony Lloyd was a Youth Treatment Manager ("YTM") employed by DYRS in May 2022.  YTMs are responsible for overseeing the progress of young people committed to DYRS.  Defendant Lloyd is sued in his personal capacity.

15.     Defendant Bernell Davis was a Supervisory Youth Development Representative ("SYDR") employed by DYRS in May 2022.  SYDRs supervise and lead Youth Development Representatives ("YDR"s) in providing direct supervision of young people committed to DYRS.  Defendant Davis is sued in his personal capacity.

4

## STATEMENT OF FACTS

**A.  J.D. is a child with multiple disabilities who, in May of 2022, was held at YSC.**

16.     In May of 2022, J.D. was held at YSC.  He was placed there after having been committed to the custody of DYRS.

17.     At the time, J.D. was fourteen years old.  Short in stature, he was only 5 feet, 3 inches tall.  He also has several disabilities: Attention-Deficit/Hyperactivity Disorder ("ADHD"), Major Depression, and a Specific Learning Disorder.  J.D. receives special education because of his disabilities and has had an Individualized Education Plan ("IEP") in place since at least 2019.

18.     At the age of fourteen, J.D. had already experienced significant trauma.  He had been diagnosed with Post-Traumatic Stress Disorder ("PTSD") and had periodic bouts of insomnia.

19.     J.D. receives medication for his ADHD, depression, and insomnia.  While at YSC, he was also prescribed bi-weekly therapy during the intake process.

**B.  On May 5, 2022, Defendant Lloyd punched J.D. in the face, fracturing his jaw in multiple places, and then strangled J.D. as he lay bleeding.**

20.     On the morning of May 5, 2022, J.D. spent time in the communal area.  In the evening, he took a shower and then went back to the communal area to enjoy the rest of his recreational time.  When J.D. went back to the communal area, he put on a facemask as a precaution to avoid contracting COVID-19.

21.     There were two YDRs on J.D.'s unit at that time: YDR Jelessa Hawthorne, who was supervising the residents on the unit, and YDR Byron Mason, who was supervising a resident on a suicide prevention watch.

22.     J.D. was feeling down that evening.  He called his mother on the phone and, hearing her voice, began to cry.  J.D. told his mother that he wanted to talk to a mental health professional.

23.     As J.D. talked with his mother, another young person on the unit yelled profanities at J.D. and told him to hang up the phone.  YDR Mason then took the phone from J.D. and ended the call.

24.     After YDR Mason ended J.D.'s phone call, J.D. continued to cry.  Frustrated that the other young person had interrupted his phone call, J.D. stood up, walked over to the door of the young person who yelled at him, spat on the floor, and started walking towards his own room.

25.     As J.D. walked, YDR Mason instructed J.D. to return to his room and began pushing him in that direction.  When J.D. told YDR Mason that he did not want to be touched or pushed into the room, YDR Mason reached out and wrapped both of his arms around J.D.'s chest to physically restrain him.  YDR Mason then moved J.D. into his room, out of view of the cameras on the unit.  YDR Hawthorne positioned herself in front of J.D.'s door.

26.     YDR Mason continued to hold J.D. in a restraint as staff called for assistance, prompting Defendants Davis and Lloyd to arrive on the unit.

27.     As a YTM, Defendant Lloyd is in charge of coordinating the treatment of young people at DYRS, but he is not a licensed therapist or mental health professional.  Defendant Davis is in charge of supervising YDRs who, in turn, supervise the young people in DYRS facilities.  The Defendants responded to staff's call for assistance, presumably to help supervise J.D. so that YDRs Mason and Hawthorne could continue monitoring the unit.

28.     When Defendants Davis and Lloyd arrived on the unit, they entered J.D.'s room. Defendant Davis told YDR Mason to let go of J.D. and YDR Mason complied.  Defendant Davis then told J.D. to sit down on his bed and to calm down.

29.     J.D. sat down on his bed and took his facemask off.  As he sat, he fidgeted with the facemask in his hand.

30.    J.D. felt despondent.  Believing he needed help coping with these feelings, he told Defendants Davis and Lloyd that he needed to speak with someone from the mental health unit.

31.    DYRS Policy requires staff to take youth mental health needs seriously.  *See* DYRS Policy V.a.6, Emergency Medical Response, Section VI.D. (Dec. 8, 2016).  DYRS staff must immediately notify behavioral health personnel if, among other things, a young person threatens to harm themselves or appears overly agitated or if staff have other reason to believe that a young person may engage in self-destructive behavior.  *Id.*

32.    Despite these directives, Defendants Davis and Lloyd did not call mental health staff to support J.D.  Instead, they kept telling J.D. that he needed to "chill out."

33.    J.D. continued to fidget with the mask in his hand.  He again asked Defendants Davis and Lloyd if he could talk to someone from the mental health unit.  Despite clear DYRS policy, Defendants Davis and Lloyd did not help.

34.    YDR Mason then came back into J.D.'s room and began inexplicably removing J.D.'s belongings until Defendant Davis told him to stop.  YDR Mason then left J.D.'s room, leaving him alone with the Defendants.

35.    J.D. asked Defendants Davis and Lloyd several more times to speak with mental health.  Again, they did not respond.

36.    At this point, J.D. was still sitting on his bed.  Defendants Davis and Lloyd both stood over J.D., with Defendant Lloyd standing directly in front of J.D. and Defendant Davis on Defendant Lloyd's right.

37.    Both Defendants were and are grown men who were significantly larger and heavier than J.D.  Defendant Lloyd stood an estimated six feet tall, and had a strong, muscular build. Defendant Davis was also approximately six feet tall and was heavy-set and imposing.

38.     As they spoke, J.D. began ripping the facemask that was in his hand.

39.     Defendant Lloyd, apparently frustrated by this behavior, told J.D. to hand the mask over.  When J.D. did not give Defendant Lloyd the mask, Defendant Davis put his hand on J.D.'s shoulder while Defendant Lloyd grabbed the mask out of J.D.'s hand.

40.     After Defendant Lloyd grabbed the mask, J.D. instinctively stood up.  At just 5 feet, 3 inches at the time, he barely reached the Defendants' shoulders.

41.     J.D. did not try to take the mask back.  Indeed, he was not moving his arms or saying anything at all when, without warning, Defendant Lloyd reached back and punched J.D. in the face with a closed fist.

42.     Defendant Lloyd's punch shattered J.D.'s jaw and the impact knocked J.D. off his feet.  J.D. fell backwards, hitting the back of his head against the wall, before landing on his bed.

43.     As J.D. lay on his bed, Defendant Lloyd climbed on top of him, wrapped both hands around J.D.'s throat, and strangled him, cutting off his airway.

44.     J.D. could not breathe or talk as Defendant Lloyd strangled him.  But he could feel blood flowing from his jaw from where Defendant Lloyd had punched him.  He could also feel one side of his jaw detached, like it was in the wrong place.   J.D. tried to tap Defendant Lloyd to try to get Defendant Lloyd to release him, but Defendant Lloyd would not let go.

45.     As Defendant Lloyd strangled J.D., Defendant Davis stood over them, watching.

46.     After several seconds, Defendant Davis told Defendant Lloyd, "chill, chill, there's blood."  Defendant Lloyd finally let go.

47.     When Defendant Lloyd let go, J.D. could feel searing pain in his jaw, his neck, and his head.  He had trouble speaking, but he tried to tell Defendant Lloyd and Defendant Davis that his jaw hurt.  He believed it was broken.

48.     Defendant Davis told J.D. that he was wrong; his jaw was not broken, and he was fine.  J.D. stood up to look at himself in the mirror.  He felt dizzy as he stood up.  When he saw his reflection in the mirror, he almost fainted.

49.     There was "endless blood" streaming out of his mouth.  His jaw seemed broken in two places: down the middle and on the left side, near his ear.  The right side of his teeth stuck up a half inch higher than the left and he could see the gums of his teeth.

50.     Below is a picture of J.D.'s jaw taken later that day.



51.     As J.D. bled profusely from his mouth, blood began to pool on the floor.

52.     Despite J.D.'s dire condition, Defendants Lloyd and Davis did not immediately run for medical help or attempt to treat J.D.  Instead, Defendant Davis tried to bribe J.D. to be silent about what had just happened.  He told J.D. that when J.D. saw medical staff, he should "tell the people that you hit your mouth on the wall."  Defendant Davis promised that, if J.D. did so, he and Defendant Lloyd would "take care of [J.D.] for the rest of [his] stay."

53.     In shock, J.D. reiterated that Defendant Lloyd had broken his jaw.  But Defendant Lloyd told him to be quiet and then asked how old J.D. was.  When J.D. responded that he was only fourteen years old, Defendant Lloyd stated, "you a youngin, I'm sorry."  He then told J.D. that if J.D. told medical staff he had hit his mouth on the wall—instead of being punched— Defendant Lloyd would give J.D. "snacks, phone calls" and whatever else J.D. wanted.

54.     J.D. did not respond.  Still bleeding and in pain, he asked Defendant Lloyd and Defendant Davis to take him to the medical unit.  Defendant Davis, however, told J.D. that he could not go to the medical unit because another resident was there.  Instead, Defendant Davis stated that he would call medical staff to come to J.D.'s room.

55.     As they waited for medical staff to arrive, Defendants Davis and Lloyd did nothing to help J.D. or stem his blood loss.  They only emphasized that J.D. should lie about the incident and how it happened.

56.     It took approximately ten minutes for a nurse and nurse practitioner to arrive at J.D.'s room.  When they arrived, J.D. was still bleeding profusely from his mouth.  His shirt and pants were covered in blood, and he had to keep spitting blood out onto the floor.

57.     The nurse and nurse practitioner transported J.D. to the medical unit in a wheelchair.  While J.D. could not move his mouth, he was able to communicate to the medical staff that his pain was at a "10/10."

58.     After medical staff examined J.D., DYRS staff took J.D. to the emergency room at Children's National Hospital ("Children's National") in Northwest, D.C, where he was admitted to the hospital.

59.     At Children's National, CT scans showed that J.D.'s jaw was broken in two places: he had a mandibular fracture in the right parasymphyseal region and a mandibular fracture in the

left mandibular ramus.  In other words, his lower jaw was broken in the middle, and on the left side, near his ear.  His jaw was also swollen on the right side.

60.    Doctors determined that J.D. would need surgery to repair his jaw.  But because the hospital did not have capacity to operate immediately, they wired his jaw shut to stabilize it until they could operate.  J.D. remained hospitalized until the surgery.

61.    On May 7, 2022, J.D. was able to have surgery to repair his jaw.  Prior to the surgery, he was still bleeding from the open fracture sites in his mouth.  He was also experiencing headaches, and his head was tender and swollen.

62.    During the surgery, surgeons implanted arch bars—metal plates that wrap around the jaw and are attached with wires around the teeth—and multiple screws to piece his jaw back together.  Doctors kept him in the hospital for observation for roughly a day and a half.

63.    While at the hospital, J.D. confided to his mother that staff had assaulted him. Concerned, J.D.'s mother asked the hospital's social services team to meet with J.D. and address his fears of returning to YSC.  J.D. met with a psychiatrist at Children's National and shared that he was worried about returning to YSC and seeing Defendant Lloyd, in particular.  The psychiatrist recommended that J.D. meet with a counselor once a week to recover from the incident.

64.    On May 9, 2022, Children's National discharged J.D., sending him back to YSC.

**C.  The damage and trauma from the assault have been long lasting.**

65.    J.D.'s discharge from Children's National did not end his ordeal.  Upon returning to YSC, J.D. crossed paths with Defendant Davis in YSC's intake unit, triggering memories of the assault and making him fearful.

66.    Because of his fragile state, DYRS had to place J.D. in the medical unit.  The hospital discharged him on a strict non-chew, liquid-only diet for six weeks.  He had rubber bands holding his jaw in place.  He could not use a straw or engage in any physical activity for six weeks.

In the days after his surgery, he could barely move his mouth.  He could not talk normally and continued experiencing pain and swelling in his jaw.

67.     J.D. also had trouble eating and, over the course of the next month, lost several pounds.

68.     In addition, the pain in J.D.'s jaw forced him to sleep on his back, a position that was uncomfortable for him and exacerbated his sleep issues.

69.     J.D. spent over two weeks in the medical unit at YSC.  During that time, he did not attend school and only received work packets that teachers dropped off.  He did not receive any supplemental instruction to make up what he had missed while in the hospital.  He also did not receive any of the specialized instruction in his IEP.  Furthermore, he could not go outside, leaving him stuck in the unit.

70.     On May 31, 2022, J.D. returned to Children's National for a follow-up appointment with a dental surgeon.  The dental surgeon he saw noted that J.D. continued to feel numbness in his lower lip and chin and was not opening his mouth properly—he kept shifting his jaw to the right.  The dentist advised that J.D. needed to practice opening his mouth in the mirror.

71.     Back in DYRS custody, J.D. tried to practice opening his jaw.  But he received no other support for his recovery, such as physical therapy or supervision for his exercises.

72.     Two weeks later, on June 14, 2022, J.D. returned to Children's Hospital again, this time to remove the metal bars and wires in his mouth.  He had to be numbed for the procedure.

73.     J.D.'s pain from the assault did not abate.  Almost a month after the assault, J.D. continued feeling severe, aching pain in his jaw and had to take pain medications for relief.  As he reported to his doctors, he still had numbness in his lower lip and chin from the incident.

74.    Roughly three years later, J.D. continues to feel pain and discomfort.  His jaw muscles ache and feel tight, especially after he talks or chews.  His jaw also pops, tingles if he touches it, and occasionally feels numb.  J.D.'s jaw involuntarily clenches, and he must routinely stretch his jaw muscles to alleviate his discomfort.

75.    J.D.'s continued jaw pain prompted him to see a dentist at the Washington Hospital Center on April 2, 2025.  The dentist noted that J.D. still feels microfacial pain in his masticatory muscles and "expected hypoesthesia" in his right jaw and lower lip after his 2022 fractures.  In addition, the dentist gave J.D. information on how to manage Temporomandibular Joint Dysfunction, a disorder of the jaw that can be associated with jaw injuries and causes chronic facial pain.[3]  To help alleviate pain, the dentist placed J.D. on a "soft chew diet" for two to three weeks, instructed him to apply heating and cold packs to his face, and prescribed a nightguard.

76.    During the visit, however, the dentist was clear: J.D.'s symptoms will never go away.  His recovery has reached its limit because his jaw is permanently misaligned.  He will continue feeling pain and discomfort for the rest of his life.

77.    In addition to his permanent physical symptoms, the assault took an immense mental and emotional toll on J.D.  It caused him to be deeply afraid that DYRS staff would assault him again and made him feel like he must constantly be alert.  J.D. is no longer comfortable with people getting physically close to him.  The assault also triggered recurring nightmares and severely impacted his pre-existing sleep issues.  As a result, he has had to use progressively stronger medications to deal with insomnia.

---

[3]    Johns       Hopkins       Medicine,       *Temporomandibular       Disorder       (TMD)*, https://www.hopkinsmedicine.org/health/conditions-and-diseases/temporomandibular-disorder-tmd (last visited Apr. 28, 2025).

78.    J.D.'s hospitalization prompted DYRS's Office of Internal Integrity ("OII") to investigate.

79.    OII interviewed J.D. and DYRS staff, reviewed video footage and medical records, and compiled an investigative report.  Its results confirmed not only the incredible harm that J.D. experienced, but also Defendants Lloyd and Davis's unconscionable actions.

80.    In the report, Defendant Davis acknowledged that he did not call mental health staff to J.D.'s room.

81.    According to the report, the nurse who responded to Defendants Lloyd and Davis's call for medical help told OII that "[t]he amount of blood" she saw upon entering J.D.'s room "caused [her] initially to pause and brace [herself] for the type of injury [she] was about to see." The nurse practitioner who responded alongside her told OII that, during her time at YSC, she had "never seen a youth covered in that much blood."

82.    The report further substantiated J.D.'s account of what had occurred and revealed Defendants Lloyd and Davis's actions to cover up the assault.  Defendant Lloyd told OII investigators that he and Defendant Davis restrained J.D. while YDR Mason was in room, and that they slipped and fell onto J.D.'s bed, causing J.D. to hit his head.  Defendant Davis told OII a similar story.  But their accounts contradicted that of YDR Mason, who stated that he released J.D. from a physical restraint when Defendants Davis and Lloyd arrived and that, when he left J.D.'s room, J.D. was not restrained.  Moreover, the nurse and nurse practitioner reported that neither Defendant Davis nor Defendant Lloyd would respond to medical staff's questions about what had happened or how J.D.'s jaw had been broken.

83.    Although the OII report chronicled Defendant Lloyd's assault, DYRS never reported the assault to District's Office of Independent Juvenile Justice Facilities Oversight

("OIJJFO") as required by the District's *Jerry M.* Work Plan and Mayor's Order 2020-115, November 13, 2020, §§ I.A.1-2.  The officially reported staff-on-youth assault rate at YSC rate for May 2022 is zero.

84.    While DYRS never reported the assault, given the severity of J.D.'s injury and his hospitalization at Children's National, DYRS could not entirely ignore what had happened, and it eventually fired Defendants Lloyd and Davis.  But despite its knowledge about the culture of abuse at DYRS facilities, the District has turned a blind eye as DYRS staff continue to assault the children in its care, allowing this disturbing pattern to continue.

**D. The District has a municipal custom of allowing staff to use excessive force to punish young people like J.D. who are committed to DYRS.**

85.    J.D.'s experience in DYRS custody is unfortunately common.  Upon information and belief, DYRS staff routinely choke, punch, or otherwise assault young people at YSC and other DYRS facilities to punish young people for small acts of actual or perceived misbehavior. This continues to happen despite numerous sources putting the District on notice of the ongoing problems, including other lawsuits, public investigations and reporting, alerts to the D.C. Council, and newspaper articles.  Upon information and belief, the assault on J.D. was preceded by numerous instances of DYRS staff using excessive force upon young people at DYRS facilities and DYRS supervisors failing to supervise staff in this regard.  Upon information and belief, these facts were known to and ignored by the District of Columbia.

86.    For example, in 2014, a boy committed to DYRS custody and held at YSC alleged that DYRS employees "'kicked, punched, [and] beat[]'" him, placed him in a chokehold "until he lost consciousness" and then subsequently dragged him into another room where he was confined.[4]

---

[4] *Monk v. District of Columbia*, No. 15-cv-1574 (EGS), 2016 U.S. Dist. LEXIS 153538, at *2 (D.D.C. Sept. 26, 2016) (citation omitted).

The boy was eventually taken to an off-site hospital, where he was "found to have suffered traumatic brain injury, subconjunctival hemorrhaging, and additional injuries to his neck, shoulders, back, face, and teeth."[5]  In subsequent litigation about the assault, the District did not dispute that officers had violated the boy's constitutional rights.[6]

87.    In May of 2023, YDRs at the DYRS facility New Beginnings tackled, choked, bit, and kicked a boy after he refused to go to his room during his recreational time.[7]  YDRs initially tried to drag the boy, named K.P., into his room.[8]  After K.P. resisted, multiple YDRs then effectively tackled K.P. to the ground, causing him to hit his head against the floor.[9]  Several of the YDRs landed on top of K.P, making it difficult for him to breathe.  As K.P. struggled to breathe, at least one YDR forced his body weight down on top of K.P., further restricting his breathing.  The YDRs then rolled K.P. into a prone position, leaving him face down on the ground as a YDR continued to press his body weight into K.P.'s back.[10]  Afraid he would choke to death, K.P. tried to get free by biting one of the YDR's arms.[11]  Infuriated, the YDR shifted his body so that more of his weight was on K.P., wrapped his left arm around K.P.'s neck, pulled K.P.'s head backwards, and squeezed K.P.'s throat between his forearm and bicep in a chokehold.[12]  The YDR held K.P. in the chokehold for approximately three and a half minutes while other YDRs placed a towel over

---

[5] *Id.* at *2–3.

[6] *Id.* at *6.

[7] *See* Disability Rights DC, *Youth at Risk: Dangerous Restraints and Excessive Seclusion at DYRS Facilities* 2, 7–12 (Nov. 2023), https://cdn.prod.website-files.com/65792ba62c7815e2cdc139a2/663a9daffe4197e0f9768133_5.6.24%20Youth%20at%20 Risk%20Report_FINAL.pdf; *see also* Complaint at 7–10, *K.P. v. District of Columbia*, No. 1:24-cv-01325 (D.D.C. May 6, 2024), ECF No. 1.

[8] *See* Disability Rights DC, *Youth at Risk*, *supra* note 7, at 6–7; *K.P.*, ECF No. 1 at 7–8.

[9] *See* Disability Rights DC, *Youth at Risk*, *supra* note 7, at 7; *K.P.*, ECF No. 1 at 8.

[10] *See* Disability Rights DC, *Youth at Risk*, *supra* note 7, at 7–9; *K.P.*, ECF No. 1 at 8.

[11] *See* Disability Rights DC, *Youth at Risk*, *supra* note 7, at 9; *K.P.*, ECF No. 1 at 8.

[12] *See* Disability Rights DC, *Youth at Risk*, *supra* note 7, at 9; *K.P.*, ECF No. 1 at 8–9.

K.P.'s face.[13]  The YDR choking K.P. then taunted him, threatened to kill him, and ultimately bit his arm.  When the YDR finally released K.P. from the chokehold, another YDR kicked K.P. as he lay restrained on the floor.[14]

88.    Disability Rights DC ("DRDC"), the nonprofit entity that serves as the federally mandated protection and advocacy program for individuals with disabilities in D.C., investigated K.P.'s assault and issued a public report in November 2023.[15]  DRDC concluded that DYRS staff did not have adequate justification to restrain K.P. and used unnecessary and unauthorized techniques, in violation of District law that bans using restraints, such as prone restraints, that put pressure on a person's neck or throat.[16]  It further admonished that DYRS "must make significant changes to its current practices" to protect the young people in its care.[17]

89.    Despite this, the assaults have persisted.  Staff have continued to choke, punch, and unlawfully restrain young people at DYRS facilities as a means of responding to actual or perceived misbehavior.

90.    Just fourteen months later, in March 2025, DRDC issued another report detailing how DYRS staff assaulted a boy held at YSC three times between the spring and fall of 2024.[18]  DRDC's investigation focused on the experience of just one boy at YSC.  Yet, as it investigated

---

[13] *See* Disability Rights DC, *Youth at Risk*, *supra* note 7, at 10; *K.P.*, ECF No. 1 at 10.

[14] *See* Disability Rights DC, *Youth at Risk*, *supra* note 7, at 10–11; *K.P.*, ECF No. 1 at 10.

[15] *See* Disability Rights DC, *Youth at Risk*, *supra* note 7.

[16] Disability Rights DC, *Youth at Risk*, *supra* note 7, at 13–15; *see also* Comprehensive Policing and Justice Reform Amendment Act of 2022, D.C. Code §§ 5-125.01–5-125.03 (effective Apr. 21, 2023).

[17] Disability Rights DC, *Youth at Risk*, *supra* note 7, at 20.

[18] Disability Rights DC, *Youth Still at Risk: A Supplement to the Disability Rights DC's Youth at Risk     Report*     (Mar.     2025),     https://cdn.prod.website-files.com/65792ba62c7815e2cdc139a2/67c5db15ed3ec4dfa0f7762d_Youth%20Still%20At%20Risk.pdf.

these assaults, it predictably uncovered other instances of excessive force by staff against additional youth in the facility.

91.    In the first incident, staff at YSC placed the boy, Jesse,[19] in a chokehold until he fell unconscious.[20]  The incident began after young people pushed tables and chairs in front of the doors in the common area and poured water on the floor.[21]  Staff approached Jesse, who was sitting down in the common area, placed their hands on him and, although Jesse appeared to stay calm, tried to restrain him.[22]  When Jesse struggled to get free, multiple staff physically restrained him and forced him into his room.[23]  Over thirty minutes later, Jesse tried to run out of his room when a staff member opened the door.  A large male staff member grabbed Jesse, placed his forearm around Jesse's neck and put him into a chokehold.  As the staff member held Jesse in a chokehold, another staff member lifted Jesse's legs off of the floor while a third grabbed Jesse's arm.[24]  Staff then held Jesse in a chokehold for at least ten seconds while they dragged him into his room.[25]  As staff dragged Jesse, he began to spit out blood and hit his head on the toilet in his room.[26]  Staff then put Jesse in handcuffs and continued to choke him until he fell unconscious.  When Jesse regained consciousness, he was under the toilet in his room with a staff member's knee and hands on his head.[27]  The assault left Jesse's face and one of his eyes bruised and swollen.[28]

---

[19] "Jesse" is a pseudonym Disability Rights used to protect the boy's identity.  *See id.* at 4 n.1.
[20] *Id.* at 15.
[21] *Id.* at 8.
[22] *Id.* at 8–9.
[23] *Id.* at 9–13.
[24] *Id.* at 13–14.
[25] *Id.* at 15.
[26] *Id.* at 15–16.
[27] *Id.*
[28] *Id.* at 16.

92.     During this same incident, a staff member grabbed another young person by the shirt with both hands.  The staff member then placed his right arm around the boy's neck, holding him in an unlawful chokehold.[29]

93.     In the fall of 2024, staff at YSC again put Jesse in a chokehold and appeared to punch his face and shoulders while restraining him.[30]  Video footage reviewed by DRDC revealed that DYRS staff broke up a physical altercation between Jesse and another youth by restraining them.[31]  One staff member held Jesse's arm, and another put him in a chokehold, causing them to fall over.  The staff member who put Jesse in a chokehold got on top of Jesse while four additional staff members entered the unit and surrounded them.  As Jesse struggled to get free, a staff member again placed his arm around Jesse's neck and pushed him onto his back while a large male staff member laid his body directly on top of Jesse.[32]  Jesse "voiced concern about his inability to breathe."[33]  Another staff member then appeared to punch Jesse with a closed fist near his face or shoulders as three staff members retrained Jesse's arms and legs.  Staff continued to restrain Jesse on the floor for eight minutes and twenty-five seconds.[34]  They eventually pushed and pulled Jesse into his room where Jesse had to use his inhaler to recover.[35]

94.     In the last incident detailed by DRDC, which also took place during the fall of 2024, staff held Jesse in a prone position on the ground for over three minutes while other staff placed their entire body weight on top of him.[36]  The incident began when Jesse ripped up a sandwich and

---

[29] *Id.*
[30] *Id.* at 18.
[31] *Id.* at 18–19.
[32] *Id.* at 19.
[33] *Id.* at 20.
[34] *Id.* at 19.
[35] *Id.* at 19–20.
[36] *Id.* at 21–22.

dropped the pieces onto the floor.  Three staff members appeared to speak with Jesse and then grabbed his arms.  When Jesse "swung out at a staff member," six staff members surrounded Jesse and attempted to pin him into the corner of the room.[37]  Staff pinned him in the corner for almost five minutes.  Jesse then managed to slide down the wall into a sitting position.  Staff forced him back onto his feet, and as he resisted, Jesse and staff fell to the ground.[38]  Staff then put Jesse in a prone position on the floor with one of his arms behind his back while a staff member lay directly on top of him and seven others intermittently retrained him.  As the staff member lay on top of Jesse, the staff member used his knee to apply pressure directly into Jesse's lower body.  Staff held Jesse in that position for over three minutes.[39]

95.    As DRDC's report emphasized, "a prone position restraint or any restraint that involves placing a staff member's entire body weight on a youth is very dangerous and [can] cause serious injury or death."[40]

96.    DRDC has alerted the District to its findings.  On May 21, 2024, DRDC testified in front of a D.C. Councilmember and the D.C. Council's ("the Council") Committee on Recreation, Libraries, and Youth Affairs about the use of force by DYRS staff.  In its testimony, DRDC explained that DYRS has "blatantly disregarded" its policies limiting the use of physical force and restraints, including those prohibiting the "'restriction of blood circulation or breathing,'" "'kicking or striking youth,'" or using "'any form of excessive physical intervention, deliberate physical abuse, or physical intervention used as coercion, punishment, or retaliation.'"[41]

---

[37] *Id.* at 21.
[38] *Id.* at 22.
[39] *Id.*
[40] *Id.*
[41] Anya Kreider, *Testimony on Behalf of Disability Rights DC at University Legal Services for the Committee on Recreation, Libraries and Youth Affairs Public Safety Concerns with Department of Youth Rehabilitation Services*, Disability Rights DC at 1–2 (May 21, 2024),

DRDC recommended that DYRS make significant changes, including overhauling its policies, to "ensure that all youth in [its] custody are safe."[42]

97.    On March 6, 2025, DRDC testified about its most recent report in front of another D.C. Councilmember and the Council's Committee on Youth Affairs.[43]  DRDC concluded that "[t]he number of staff involved in the recent incidents is indicative of a culture at DYRS[.]"  And it lamented that "[f]or over a year" DRDC had been urging DYRS to change its policies and practices.[44]

98.    In addition to DRDC, attorneys who work with youth in DYRS custody are familiar with staff reacting to youth's nonviolent, nonthreatening noncompliance with instructions—by, for example, verbally refusing to enter their room when instructed—with disproportionate violence.

99.    In less extreme cases, that disproportionate violence includes aggressive physical contact and the use of restraint holds.  In more extreme cases, that disproportionate violence includes DYRS staff dragging youths across the floor, slamming them (sometimes headfirst) into walls and floors, punching and kicking them, and holding them in potentially asphyxiating holds. In both cases, the use of violent and aggressive responses towards youth in their care is inappropriate.

---

https://cdn.prod.website-files.com/65792ba62c7815e2cdc139a2/66575ae28f461cbcedb3efdc_DRDC%205.21%20DYRS%20Roundtable%20Testimony.pdf (quoting Dep't of Youth Rehab. Serv., Policy and Procedures Manual IV.c.3.iii § II.A (2019)).

[42] *Id.* at 3.

[43] Anya Kreider, *Testimony on Behalf of Disability Rights DC at University Legal Services For the Committee on Recreation, Libraries and Youth Affairs Agency Performance Oversight: Department of Youth Rehabilitation Services*, Disability Rights DC (Mar. 6, 2025), https://cdn.prod.website-files.com/65792ba62c7815e2cdc139a2/67d057b7e2b61e05c4b03947_2025.3.6.DRDC%20DYRS%20Oversight%20Testimony.pdf.

[44] *Id.* at 2.

100.    Whitney Louchheim is the Co-Founder and Chief Operating Officer of Open City Advocates, an organization that provides legal representation and holistic advocacy to youth who have been committed to DYRS.  Based on her 20 years of experience, Ms. Louchheim estimates that all or nearly all of the youth served by Open City Advocates have either personally experienced disproportionate violence by DYRS staff or witnessed such staff-on-youth violence firsthand.  She estimates that Open City Advocates encounters at least one incident per year of extreme staff-on-youth violence akin to that described in paragraph 99.  Open City Advocates has already encountered at least two such incidents in 2025.  And they encountered approximately four such incidents in 2024.

101.    The pattern of assaults at DYRS has also been covered by local press.  For instance, in April 2025, the Washington CityPaper followed up with DYRS about the assaults in DRDC's report.  The agency would not confirm whether any of the staff involved in the assaults were still employed by DYRS.[45]

102.    As reflected by DRDC's reports and testimony, Ms. Louchheim's experience, and the multiple lawsuits against DYRS, the attack on J.D. is part of a broader pattern in which DYRS staff regularly use excessive physical force—including choking and punching—to punish young people in their care when they perceive young people to be "acting out."

103.    The District has knowingly ignored this pattern.  DYRS leadership, including Darrell Foster, DYRS's superintendent, have been aware of staff assaults of young people since at least 2022.  For instance, Mr. Foster has received OII reports—including in J.D.'s case—detailing uses of excessive force against young people and concluding that staff violated DYRS policies on

---

[45] Sloane Airey, *Legal Watchdog Uncovers 'Disturbing' Abuse at D.C. Youth Detention Facility*, Washington CityPaper (Apr. 3, 2025), https://washingtoncitypaper.com/article/761625/dyrs-drdc-youth-detention-abuse-choke-hold/.

the use of physical intervention.  The Council has heard DRDC's testimony incorporating its reports and cautioning that DYRS "must make significant changes to its current practices."[46]  And during the most recent DYRS oversight hearing before the Council, the Director of DYRS, Sam Abed, referenced DRDC's report, indicating that he was aware of its contents.[47]

104.    Despite being on notice of the recurring staff abuse, the District has not taken steps to protect the children in its care.  For instance, DYRS has failed to (1) effectively revise its training and policies despite the multiple reports of staff-on-youth assaults, (2) consistently discipline staff for excessive force, or (3) report the assaults to OIJJFO as required by the District's *Jerry M.* Work and Mayor's Order 2020-115, November 13, 2020, §§ I.A.1-2.

105.    First, upon information and belief, DYRS has not changed its policies or training on physical intervention and de-escalation to prevent staff-on-youth assaults.  DYRS published its current policy on the use of physical intervention in 2019.  *See* DYRS Policy IV.c.3.iii., Use of Physical Intervention (Mar. 13, 2019).  To the extent it has made changes, those changes have not been effective at stopping its custom of assaulting children in its care.

106.    Second, the District, upon information and belief, fails to consistently discipline staff for clear instances of excessive force.  To the extent it does discipline staff for using excessive force, the discipline is not sufficient to stop its custom of assaulting children in its care.  For instance, in *K.P. v. District of Columbia*, K.P. alleged that none of the YDRs who choked, bit, or

---

[46] Disability Rights DC, *Youth at Risk*, *supra* note 7, at 20; *see also* Anya Kreider, *Testimony on Behalf of Disability Rights DC*, *supra* note 41; Anya Kreider, *Testimony on Behalf of Disability Rights DC*, *supra* note 43.

[47] Council of the District of Columbia, Committee on Youth Affairs, *Performance Oversight Hearing*, at 7:45:40 (Mar. 6, 2025), https://dc.granicus.com/MediaPlayer.php?view_id=63&clip_id=9400.

kicked him had faced disciplinary action.[48]   And although the officers in J.D.'s case faced

discipline, staff assaults have continued.   By failing to consistently discipline staff who assault

young people in DYRS custody, the District reinforces that, despite its written policies, staff may

use dangerous and excessive physical force to punish youth for actual or perceived misbehavior.

107.    Finally, the District has buttressed its policy of using excessive physical force to

punish children in its care by failing to report staff assaults to OIJJFO.   As described above, the

District did not report J.D.'s May 5, 2022 assault as a "staff-on-youth assault" to OIJJFO.   The

officially reported staff-on-youth assault rate for May 2022 is zero.   It similarly did not report K.P's

May 7, 2023 assault as a "staff-on-youth assault" to OIJJFO.   The officially reported staff-on-youth

assault rate for May 2023 is zero.   Nor did the District report the two staff assaults against Jesse in

the fall of 2024.   The officially reported staff-on-youth assault rate for August 2024 through

December 2024 is, again, zero.   These reporting failures are not an anomaly.   Indeed, OIJJFO noted

in its 2022 report: "[t]he number of documented staff-on-youth assaults for January and February

2022 undercounts the number of actual incidents."[49]

108.    By failing to report incidents as staff-on-youth assaults, the District shields itself

from accountability and transparency.   By failing to change its policies, consistently discipline

staff, or report staff-on-youth assaults, the District enables these practices to continue and signals

to DYRS staff that their use of excessive force is acceptable.

---

[48] Complaint at 13, *K.P. v. District of Columbia*, No. 1:24-cv-01325 (D.D.C. May 6, 2024), ECF
No. 1.
[49] *See* Office of Independent Juvenile Justice Facilities Oversight, *Critical Incidents and Assaults
at the Youth Services Center and New Beginnings Youth Development Center, Report 2022-3*, (Oct.
4, 2022), https://oijjfo.dc.gov/sites/default/files/dc/sites/oijjfo/publication/attachments/Critical-
Incidents-and-Assaults-at-the-YSC-and-New-Beginnings-10-4-22.pdf.

109.     Defendant Lloyd and Defendant Davis's actions conformed to DYRS's de facto policy.  In this instance, J.D. failed to comply with orders to turn over the facemask in his hand. J.D. then stood up when Defendant Lloyd took the facemask from him.  Defendant Lloyd immediately and violently punished J.D. for his behavior by punching J.D. in the jaw and then strangling him as Defendant Davis watched.  That Defendant Lloyd felt comfortable brazenly punching and strangling J.D. in front of Defendant Davis, who holds a supervisory role, suggests that Defendant Lloyd was acting pursuant to the District's unofficial policy of assaulting young people.  Defendant Davis's failure to immediately step in and stop Defendant Lloyd's attack further supports this conclusion.

110.     J.D. remains held in a DYRS facility.  He reasonably fears that DYRS staff will again assault him pursuant to the District's policy of violence.

## CAUSES OF ACTION

### Count I.
### 42 U.S.C. § 1983 – Violation of Substantive Due Process Under the Fifth Amendment Against Defendants Lloyd and Davis in Their Personal Capacities)

111.     Plaintiff re-alleges and incorporates by reference the allegations set forth above as if fully set forth herein.

112.     Defendant Lloyd, at all times relevant hereto, was acting under color of District of Columbia law in his capacity as a YTM of DYRS, and his acts and omissions were conducted within the scope of his employment.

113.     Defendant Davis, at all times relevant hereto, was acting under the color of District of Columbia law in his capacity as an SYDR of DYRS, and his acts and omissions were conducted within the scope of his employment.

114. The Due Process Clause of the Fifth Amendment of the United States Constitution prohibits the deprivation of "life, liberty, or property, without due process of law." U.S. Const. amend. V. This prohibition confers an affirmative duty upon government officials to care for and protect detained individuals in their care. It also protects detained individuals from the use of excessive force that amounts to punishment.

115. Government officials violate due process under the Fifth Amendment by personally using excessive force against a detained person or by remaining deliberately indifferent to a substantial risk to a detained person's health or safety.

116. At the time of the actions described herein, J.D. was in the custody and care of DYRS, and thus the District, through its agents—including Defendants Davis and Lloyd—had a duty to assume responsibility for J.D.'s safety and well-being.

117. In punching and strangling J.D., Defendant Lloyd used excessive force amounting to punishment and violated his affirmative duty to protect J.D. from harm.

118. Defendant Lloyd's actions and use of force were objectively unreasonable under the circumstances. Defendant Lloyd further acted maliciously and sadistically for the purpose of causing J.D. harm. Prior to Defendant Lloyd's use of force, he, Defendant Davis, and J.D. were engaged in a conversation as J.D. sat on his bed in his room. J.D. did not verbally or physically threaten Defendant Lloyd or Defendant Davis. J.D. simply stood up after Defendant Lloyd grabbed a facemask out of J.D.'s hand. In response, Defendant Lloyd punched J.D., fracturing his jaw in two places and causing J.D. to fall backwards onto his bed, hitting his head as he fell. Defendant Lloyd then strangled J.D. as he lay bleeding.

119. As described herein, J.D. suffered extensive and permanent injuries. Among other things, J.D. had to undergo surgery to repair his jaw and a procedure to remove the metal plates

and wires from his initial operation.  He could not eat solid foods for six weeks. He continues to feel pain and numbness in his jaw, which is permanently misaligned.  He has also experienced trauma, recurring nightmares, and severe sleep issues.

120.    Defendant Davis violated his duty to protect J.D. from harm by acting with deliberate indifference towards the substantial risk of harm that Defendant Lloyd's actions posed. Defendant Davis observed Defendant Lloyd's use of excessive force.  He stood next to Defendant Lloyd and watched as Defendant Lloyd punched J.D.  He continued to watch as Defendant Lloyd climbed on top of J.D., wrapped both hands around his neck, and strangled J.D.  Defendant Davis had sufficient time to intervene in order to prevent or mitigate injury to J.D., and yet chose not to act until Defendant Lloyd had strangled J.D. for several seconds.

121.    As a direct and proximate result of Defendants Lloyd and Davis's failure to safeguard and protect J.D. while in DYRS custody, J.D. was deprived of his rights secured by the United States Constitution under the Fifth Amendment.

122.    As a direct and proximate result of Defendants Lloyd and Davis's unlawful conduct, J.D. suffered substantial harm, including, but not limited to, physical pain and suffering and both mental and emotional distress.

123.    J.D. is therefore entitled to compensatory damages pursuant to 42 U.S.C. § 1983 to compensate him for his injuries and for the violation of his constitutional and civil rights.

124.    J.D. is further entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988, prejudgment interest, and costs as allowed by federal law.

125.    J.D. is further entitled to punitive damages against Defendants Lloyd and Davis under 42 U.S.C. § 1983 in that their actions were taken maliciously, willfully, or with a reckless or wanton disregard of J.D.'s constitutional rights.

**Count II.**
**42 U.S.C. § 1983 – Excessive Force in Violation of the Eighth Amendment (Against**
**Defendant Lloyd in His Personal Capacity)**

126.    Plaintiff re-alleges and incorporates by reference the allegations set forth above as if fully set forth herein.

127.    While the D.C. Circuit has not decided the question, many of its sister circuits have held that due process under the Fourteenth Amendment of the United States Constitution—rather than the Eighth Amendment—governs the rights of juveniles held in state juvenile detention facilities.  *See Santana v. Collazo*, 714 F.2d 1172, 1179–81 (1st Cir. 1983) (applying due process under the Fourteenth Amendment to conditions of confinement at a juvenile detention facility); *Gary H. v. Hegstrom*, 831 F.2d 1430, 1432 (9th Cir. 1987) (same); *Milonas v. Williams*, 691 F.2d 931, 942 & n.10 (10th Cir. 1982) (same); *see also A.J. ex rel. L.B. v. Kierst*, 56 F.3d 849, 854 (8th Cir. 1995) (applying due process under the Fourteenth Amendment in case involving juvenile pretrial detainees); *H.C. v. Jarrard*, 786 F.2d 1080, 1085 (11th Cir. 1986) (same).

128.    Nevertheless, J.D. alleges that, in the alternative, he has a constitutional right under the Eighth Amendment of the United States Constitution to be free from cruel and unusual punishments at the hands of prison officials.  This includes the right to be free from excessive force.

129.    Defendant Lloyd, at all times relevant hereto, was acting under color of District of Columbia law in his capacity as a YTM of DYRS, and his acts and omissions were conducted within the scope of his employment.

130.    Defendant Lloyd violated J.D.'s right to be free from excessive force when Defendant Lloyd punched J.D. in the jaw with a closed fist, fracturing his jaw in two places.  Prior to Defendant Lloyd's use of force, he, Defendant Davis, and J.D. were engaged in a conversation as J.D. sat on his bed in his room.  J.D. did not verbally or physically threaten Defendant Lloyd or

Defendant Davis. J.D. simply stood up after Defendant Lloyd grabbed a facemask out of J.D.'s hand. In response, Defendant Lloyd punched J.D., fracturing his jaw in two places and causing J.D. to fall backwards onto his bed, hitting his head as he fell.

131.    Defendant Lloyd further violated J.D.'s right to be free from excessive force by climbing on top of J.D., wrapping both hands around J.D.'s neck, and strangling J.D. as he lay bleeding on his bed.

132.    As described herein, J.D. suffered extensive and permanent injuries from Defendant Lloyd's use of force. Among other things, J.D. had to undergo surgery to repair his jaw and a procedure to remove the metal plates and wires from his initial operation and could not eat solid foods for six weeks. He continues to feel pain and numbness in his jaw, which is permanently misaligned. He has also experienced trauma, recurring nightmares, and severe sleep issues.

133.    Defendant Lloyd's actions and use of force were objectively unreasonable in light of the facts and circumstances confronting him.

134.    Defendant Lloyd's actions and use of force were also malicious, sadistic, and for the purpose of causing harm and involved reckless, callous, and deliberate indifference to J.D.'s federally protected rights.

135.    As a direct and proximate result of Defendant Lloyd's excessive force, J.D. was deprived of his rights secured by the United States Constitution under the Eighth Amendment.

136.    As a direct and proximate result of Defendant Lloyd's unlawful conduct, J.D. suffered substantial harm, including, but not limited to, physical pain and suffering and both mental and emotional distress.

137.    J.D. is therefore entitled to compensatory damages pursuant to 42 U.S.C. § 1983 to compensate him for his injuries and for the violation of his constitutional and civil rights.

138.    J.D. is further entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988, prejudgment interest, and costs as allowed by federal law.

139.    J.D. is further entitled to punitive damages against Defendant Lloyd under 42 U.S.C. § 1983 in that Defendant's actions were taken maliciously, willfully, or with a reckless or wanton disregard of J.D.'s constitutional rights.

<u>**Count III.**</u>
<u>**42 U.S.C. § 1983 – Bystander Liability in Violation of the Eighth Amendment (Against Defendant Davis in His Personal Capacity)**</u>

140.    Plaintiff re-alleges and incorporates by reference the allegations set forth above as if fully set forth herein.

141.    Defendant Davis, at all times relevant hereto, was acting under the color of District of Columbia law in his capacity as an SYDR of DYRS, and his acts and omissions were conducted within the scope of his employment.

142.    As alleged above, J.D. has a constitutional right under the Fifth Amendment of the United States Constitution to due process of law, which imposes an affirmative duty upon government officials to care for and protect detained individuals in their care.  In the alternative, J.D. has a constitutional right under the Eighth Amendment of the United States Constitution to be free from cruel and unusual punishments at the hands of prison officials.  Prison officials violate this right not only by personally using excessive force against an incarcerated person, but also by remaining deliberately indifferent to a substantial risk to an incarcerated person's health or safety.

143.    Defendant Lloyd's use of force against J.D. was so excessive, violent, and beyond the bounds of decency that it shocks the conscience.  Defendant Lloyd maliciously intended to cause harm to J.D.

144.    Defendant Davis knew or should have known that Defendant Lloyd was using unlawful excessive force.  Indeed, Defendant Davis stood next to Defendant Lloyd and watched

as Defendant Lloyd punched J.D., fracturing his jaw in two places. Defendant Davis then watched as Defendant Lloyd climbed on top of J.D., wrapped both hands around J.D.'s neck and strangled J.D. as he lay bleeding on his bed. Defendant Davis further watched as J.D. tapped Defendant Lloyd on the arm in an effort to get him to let go.

145.    Defendant Davis had sufficient time to intervene in order to prevent or mitigate injury to J.D. and yet chose not to act until Defendant Lloyd had strangled J.D. for several seconds.

146.    As a direct and proximate result of Defendant Davis's deliberate indifference to a substantial risk to J.D.'s health and safety, J.D. was deprived of his rights secured by the United States Constitution under the Eighth Amendment.

147.    As a direct and proximate result of Defendant Davis's unlawful conduct, J.D. suffered substantial harm, including, but not limited to, physical pain and suffering and both mental and emotional distress. Among other things, J.D. had to undergo reconstructive surgery to repair his jaw and a procedure to remove the metal plates and wires from his initial operation. He could not eat solid foods for six weeks. He continues to feel pain and numbness in his jaw, which is permanently misaligned. He has also experienced trauma, recurring nightmares, and severe sleep issues.

148.    J.D. is therefore entitled to compensatory damages pursuant to 42 U.S.C. § 1983 to compensate him for his injuries and for the violation of his constitutional and civil rights.

149.    J.D. is further entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988, prejudgment interest, and costs as allowed by federal law.

150.    J.D. is further entitled to punitive damages against Defendant Davis under 42 U.S.C. § 1983 in that his actions were taken maliciously, willfully, or with a reckless or wanton disregard of J.D.'s constitutional rights.

**Count IV.**
**42 U.S.C. § 1983 – Violation of the Fifth Amendment, or in the alternative Eighth Amendment (Against Defendant District of Columbia)**

151.    Plaintiff re-alleges and incorporates by reference the allegations set forth above as if fully set forth herein.

152.    A municipality is liable under 42 U.S.C. § 1983 for constitutional violations that result from the implementation or execution of a municipal policy, practice, or custom.

153.    As described above, J.D. suffered violations of his Fifth, or, in the alternative, his Eighth Amendment rights at the hands of Defendant Lloyd, who punched and strangled J.D., and Defendant Davis, who failed to intervene as Defendant Lloyd strangled J.D.

154.    The District has a policy, practice, and/or custom of allowing staff to use excessive force in response to the actual or perceived misbehavior of young people in DYRS custody.  As alleged herein, upon information and belief, there are numerous incidents in which DYRS staff have punched, tackled, choked, suffocated, bit, and kicked children in its care.

155.    J.D.'s assault by DYRS staff is demonstrative of this policy.  In violating J.D.'s constitutional rights, Defendants Lloyd and Davis acted pursuant to DYRS's policy, practice, or custom of using excessive force.  As alleged herein, Defendant Lloyd reacted to J.D.'s perceived defiance—his decision to stand up—by punching and strangling J.D.  That Defendant Lloyd felt comfortable punching and strangling J.D. in front of Defendant Davis, who holds a supervisory role, suggests that Defendant Lloyd was acting in the normal course and following the District's de facto policy of assaulting young people for acting out.

156.    Multiple District policymakers have actual or constructive knowledge of DYRS's policy, practice, or custom of using excessive force to punish the young people in its care.  The

District has been served with at least two lawsuits alleging excessive force by DYRS staff.[50] DYRS's Superintendent, Darrell Foster, has received OII reports, including in J.D.'s case, detailing excessive force by staff. In addition, DRDC has published two reports on the use of excessive force by DYRS staff.[51] DRDC has testified about these reports before D.C. Councilmembers and the Council's Committee on Recreation, Libraries, and Youth Affairs and the Committee on Youth Affairs during the Council's Performance Oversight of DYRS.[52] And the Director of DYRS, Sam Abed, has referenced DRDC's most recent report, indicating that he is aware of its contents.[53]

157. Despite its knowledge of the pervasive use of force at DYRS, the District has ignored the problem. As described herein, the District has failed to (1) effectively revise its policies and practices to prevent staff assaults, (2) consistently discipline staff for excessive force, and (3) report the assaults to OIJJFO as required by the District's Jerry M. Work and Mayor's Order 2020-115, November 13, 2020, §§ I.A.1-2.

158. As a direct and proximate result of the District's acts and omissions, J.D. was deprived of his rights secured by the United States Constitution under the Fifth and Eighth Amendments.

159. As a direct and proximate result of the District's acts and omissions, J.D. suffered substantial harm, including, but not limited to, physical pain and suffering and both mental and emotional distress.

---

[50] *See Monk*, 2016 Dist. LEXIS 153538, at *1; *K.P.*, ECF No. 1 at 16–27.

[51] Disability Rights DC, *Youth at Risk*, *supra* note 7; Disability Rights DC, *Youth Still at Risk*, *supra* note 18.

[52] Anya Kreider, *Testimony on Behalf of Disability Rights DC* (May 21, 2024), *supra* note 41; Anya Kreider, *Testimony on Behalf of Disability Rights DC* (Mar. 6, 2025), *supra* note 43.

[53] Council of the District of Columbia, Committee on Youth Affairs, *Performance Oversight Hearing*, *supra* note 47 at 7:45:40.

160.    J.D. is therefore entitled to compensatory damages pursuant to 42 U.S.C. § 1983 to compensate him for his injuries and for the violation of his constitutional and civil rights.

161.    J.D. is further entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988, prejudgment interest, and costs as allowed by federal law.

162.    J.D. is further entitled to injunctive relief.  Unless the District changes its policies and practices, its acts and omissions will continue to pose an imminent threat to J.D.'s constitutional rights.  J.D. is still held at a DYRS facility and subject to the District's policy of using excessive force to punish the young people in its care.  If appropriate declaratory and injunctive relief is not granted, J.D. may suffer harms that will be irreparable, may lead to severe injury or death, and will continue for the foreseeable future.

## Count V.
## Battery Via District of Columbia Common Law (Against Defendant Lloyd in His Personal Capacity)

163.    Plaintiff re-alleges and incorporates by reference the allegations set forth above as if fully set forth herein.

164.    Defendant Lloyd purposefully punched and then strangled J.D.  His conduct was offensive and caused J.D. physical harm and severe mental and emotional distress.

165.    Furthermore, Defendant Lloyd's use of force was not warranted during his interactions with J.D.  J.D. never struck Defendant Lloyd or attempted to physically fight him.  Defendant Lloyd, thus, could not have reasonably perceived any harm or threat that would have justified his misconduct.

166.    As a direct and proximate cause of Defendant Lloyd's battery, J.D. suffered substantial harm, including, but not limited to, physical pain and suffering and both mental and emotional distress.  J.D. is therefore entitled to compensatory damages.

167.    Defendant Lloyd's actions were also taken with ill will, recklessness, oppressiveness, willful disregard of J.D.'s rights, or malice, entitling J.D. to punitive damages.

**Count VI.**
**Battery Via District of Columbia Common Law (Against Defendant District of Columbia)**

168.    Plaintiff re-alleges and incorporates by reference the allegations set forth above as if fully set forth herein.

169.    At all times relevant during the circumstances described herein, Defendant Lloyd was acting within the scope of his duties as a YTM employed by DYRS.

170.    As alleged herein, Defendant Lloyd purposefully punched and then strangled J.D. His conduct was offensive and caused J.D. physical harm and severe mental and emotional distress.   His conduct was also unreasonable and not warranted during Defendant Lloyd's interaction with J.D.

171.    The District of Columbia is vicariously liable for the tortious and negligent acts of its own officers acting within the scope of their employment.   J.D. is therefore entitled to compensatory damages.

**Count VII.**
**Negligence Via District of Columbia Common Law (Against Defendant Davis in His Personal Capacity)**

172.    Plaintiff re-alleges and incorporates by reference the allegations set forth above as if fully set forth herein.

173.    At the time of the actions described herein, J.D. was in the custody of DYRS.

174.    After Defendants Davis and Lloyd secured J.D. in his room, Defendant Davis watched as Defendant Lloyd punched J.D. in the jaw, knocking him backwards onto his bed. Defendant Davis then watched as Defendant Lloyd climbed on top of J.D. and strangled him for several seconds.

175.    Defendant Davis had an affirmative duty to care for and protect J.D. from the battery being committed by his fellow DYRS employee.

176.    By failing to initially intervene, Defendant Davis breached his obligation to exercise reasonable care under the circumstances in the protection and safekeeping of young people in DYRS custody.

177.    As a direct and proximate cause of Defendant Davis's actions, J.D. suffered substantial harm, including, but not limited to, physical pain and suffering and both mental and emotional distress.  J.D. is therefore entitled to compensatory damages.

<u>Count VIII.</u>
<u>Negligence Via District of Columbia Common Law (Against Defendant District of Columbia)</u>

178.    Plaintiff re-alleges and incorporates by reference the allegations set forth above as if fully set forth herein.

179.    At all times relevant during the circumstances described herein, Defendant Davis was acting within the scope of his duties as an SYDR employed by DYRS.

180.    At the time of the actions described herein, J.D. was in the custody of DYRS.

181.    After Defendants Davis and Lloyd had secured J.D. in his room, Defendant Davis watched as Defendant Lloyd punched J.D. in the jaw, knocking him backwards onto his bed. Defendant Davis then watched as Defendant Lloyd climbed on top of J.D. and strangled him for several seconds.

182.    Defendant Davis had an affirmative duty to care for and protect J.D. from the battery being committed by his fellow DYRS employee.

183.    By failing to initially intervene, Defendant Davis breached his obligation to exercise reasonable care under the circumstances in the protection and safekeeping of young people in DYRS custody.

184.    The District of Columbia is vicariously liable for the tortious and negligent acts of its own officers acting within the scope of their employment.  J.D. is therefore entitled to compensatory damages.

<u>**Count VIII.**</u>
<u>**Intentional Infliction of Emotional Distress (Against Defendant Lloyd in His Personal Capacity)**</u>

185.    Plaintiff re-alleges and incorporates by reference the allegations set forth above as if fully set forth herein.

186.    By the actions described herein, Defendant Lloyd engaged in extreme and outrageous conduct, including (but not limited to) punching J.D. with a closed fist in the jaw and then strangling J.D.  As described above, Defendant Lloyd's punch fractured J.D.'s jaw in two places and caused J.D. to fall backwards, hitting his head against the wall.  Defendant Lloyd then climbed on top of J.D. and strangled him with both hands as J.D. lay bleeding profusely.  J.D. was only fourteen years old at the time.

187.    Defendant Lloyd undertook the actions described herein, including punching and strangling J.D., in an intentional and/or reckless manner.

188.    The conduct described herein is extreme and outrageous conduct that went beyond all possible bounds of decency and would be regarded as atrocious and utterly intolerable in a civilized community.

189.    As a direct and proximate cause of Defendant Lloyd's actions, J.D. has suffered severe emotional distress as described herein.  J.D. is therefore entitled to compensatory damages.

190.    Defendant Lloyd's actions were also taken with ill will, recklessness, oppressiveness, willful disregard of J.D.'s rights, or malice, entitling J.D. to punitive damages.

**Count IX.**
**Intentional Infliction of Emotional Distress (Against Defendant District of Columbia)**

191.    Plaintiff re-alleges and incorporates by reference the allegations set forth above as if fully set forth herein.

192.    At all times relevant during the circumstances described herein, Defendant Lloyd was acting within the scope of his duties as a YTM employed by DYRS.

193.    By the actions described herein, Defendant Lloyd engaged in extreme and outrageous conduct, including (but not limited to) punching J.D. with a closed fist in the jaw and then strangling J.D.  As described above, Defendant Lloyd's punch fractured J.D.'s jaw in two places and caused J.D. to fall backwards, hitting his head against the wall.  Defendant Lloyd then got on top of J.D. and strangled him with both hands as J.D. lay bleeding profusely.  J.D. was only fourteen years old at the time.

194.    Defendant Lloyd undertook the actions described herein, including punching and strangling J.D., in an intentional and/or reckless manner.

195.    The conduct described herein is extreme and outrageous conduct that went beyond all possible bounds of decency and would be regarded as atrocious and utterly intolerable in a civilized community.

196.    The District of Columbia is vicariously liable for the tortious and negligent acts of its own officers acting within the scope of their employment.   J.D. is therefore entitled to compensatory damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

a.    Enter a judgment in favor of Plaintiff;

b.    Declare that:

i.   The individual Defendants violated Plaintiff's rights under the Fifth Amendment to the United States Constitution or, in the alternative, the individual Defendants violated Plaintiff's rights under the Eighth Amendment to the United States Constitution;

ii.   The individual Defendants violated Plaintiff's rights under District of Columbia law;

iii.   The District violated Plaintiff's rights under the Fifth Amendment to the United States Constitution, as well as under District of Columbia law, or, in the alternative, the District violated Plaintiff's rights under the Eighth Amendment to the United States Constitution, as well as under District of Columbia law;

iv.   The District is continuing to violate Plaintiff's rights under the Fifth Amendment to the United States Constitution, or, in the alternative, the District is continuing to violate Plaintiff's rights under the Eighth Amendment to the United States Constitution;

c.   Enjoin the District from further subjecting J.D. to violations of his rights under the Fifth or, in the alternative, under the Eighth Amendment to the United States Constitution, including, but not limited to, physical assault and emotional abuse by DYRS staff members, by:

i.   Requiring the District to meaningfully address and prevent staff-on-youth assaults against Plaintiff and other young people in custody at DYRS facilities by, *inter alia*, implementing revised training,

supervision, disciplinary, retention, and reporting policies that apply to staff involved in staff-on-youth assaults;

d.    Award Plaintiff compensatory damages, including all appropriate pre- and post-judgment interest, in an amount to be determined, for the injuries caused by the conduct of the Defendants alleged herein (as well as the cost of treating those injuries), including, but not limited to: physical harm, emotional distress, pain and suffering, embarrassment, and feelings of unjust treatment;

e.    Award Plaintiff punitive damages against the individual Defendants in an amount to be determined for the intentional and reckless conduct alleged herein that would effectively deter the Defendants and others similarly situated from engaging in similar conduct in the future;

f.    Retain jurisdiction in this case until the unlawful policies, practices, and customs complained of herein no longer exist and the District has demonstrated to this Court that they will not recur;

g.    Award Plaintiff the costs of this action, including reasonable attorneys' fees;

h.    Grant such additional relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues triable.

DATE: May 2, 2025                    Respectfully submitted,

                                /s/ Ellie M. Driscoll

Ellie M. Driscoll (D.C. Bar No. 90017817)
Marja K. Plater (D.C. Bar No. 90002586)
WASHINGTON LAWYERS' COMMITTEE FOR

CIVIL RIGHTS & URBAN AFFAIRS
700 14th Street NW, Suite 400
Washington, DC 20005
Tel: (202) 319-1000
ellie_driscoll@washlaw.org
marja_plater@washlaw.org

*Counsel for Plaintiff J.D.*