**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| J.D.,<br><br>  *Plaintiff*,<br><br> v.<br><br> DISTRICT OF COLUMBIA, *et al.*,<br><br>  *Defendants*. | Civil Action No. 25 - 1349 (LLA) |

## MEMORANDUM OPINION AND ORDER

J.D. brings this action against the District of Columbia and two former employees of the D.C. Department of Youth Rehabilitation Services ("DYRS"), Anthony Lloyd and Bernell Davis, alleging that Mr. Lloyd and Mr. Davis violently assaulted him while he was a minor in DYRS's custody in violation of the Fifth and Eighth Amendments of the U.S. Constitution and District of Columbia common law.  ECF No. 1.  He seeks injunctive and declaratory relief, compensatory and punitive damages, and attorney's fees and costs.  *Id.* ¶¶ 111-196.  The District has moved to dismiss J.D.'s requests for injunctive and prospective declaratory relief and his Fifth Amendment claim against the District.  ECF No. 21.  For the reasons discussed below, the court grants the District's partial motion to dismiss as it concerns J.D.'s claims for injunctive and prospective declaratory relief but denies the motion as it concerns J.D.'s Fifth Amendment claim against the District.

### I.    FACTUAL BACKGROUND

The court accepts the following factual allegations from J.D.'s complaint as true for purposes of deciding the motion to dismiss.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In

May 2022, J.D. was fourteen years old, committed to DYRS custody, and living at DYRS's Youth Services Center ("YSC"). ECF No. 1 ¶¶ 12, 16-17. At the time, Mr. Lloyd was a DYRS Youth Treatment Manager, and Mr. Davis was a Supervisory Youth Development Representative. *Id.* ¶¶ 14-15.[1] Both were responsible for overseeing children committed to DYRS custody. *Id.*

On the evening of May 5, J.D. was spending recreational time in a communal area. *Id.* ¶ 20. He felt "down" and called his mother, Jane Doe; when he heard her voice, he began to cry. *Id.* ¶¶ 12, 22. J.D. told his mother that he wanted to talk to a mental health professional. *Id.* ¶ 22. While J.D. was on the phone, another resident "yelled profanities at J.D. and told him to hang up." *Id.* ¶ 23. Byron Mason, a Youth Development Representative supervising a different resident who was on suicide prevention watch that evening, "took the phone from J.D. and ended the call." *Id.* J.D. continued crying and, "[f]rustrated that the other young person had interrupted his phone call, J.D. stood up, walked over to [that person's] door . . . , spat on the floor, and started walking toward[] his own room." *Id.* ¶ 24.

Mr. Mason instructed J.D. to return to his room and pushed him in that direction. *Id.* ¶ 25. J.D. responded by telling Mr. Mason that he did not want to be touched or pushed. *Id.* Mr. Mason then "reached out and wrapped both of his arms around J.D.'s chest to physically restrain him" and "moved J.D. into his room." *Id.* The other Youth Development Representative on J.D.'s unit that night, Jelessa Hawthorne, positioned herself in front of J.D.'s door as Mr. Mason continued restraining J.D. and called for assistance. *Id.*

---

[1] Youth Treatment Managers "are responsible for overseeing the progress of young people committed to DYRS," ECF No. 1 ¶ 14, and Supervisory Youth Development Representatives oversee Youth Development Representatives, who "provid[e] direct supervision of young people committed to DYRS," *id.* ¶ 15.

Mr. Davis and Mr. Lloyd arrived and entered J.D.'s room.  *Id.* ¶¶ 26, 28.  Mr. Davis, who supervises Mr. Mason, ordered Mr. Mason to let go of J.D.  *Id.* ¶ 28.[2]  Mr. Davis then told J.D. to sit on his bed and calm down.  *Id.*  After sitting down, J.D. removed the face mask he had been wearing due to the COVID-19 pandemic and told Mr. Davis and Mr. Lloyd that he needed to speak with staff from the mental health unit.  *Id.* ¶¶ 20, 29-30.  Neither called the mental health unit; instead, they "kept telling J.D. that he needed to 'chill out.'"  *Id.* ¶ 32.  J.D. asked several more times to speak with someone in the mental health unit, but Mr. Davis and Mr. Lloyd did not respond.  *Id.* ¶¶ 33, 35.

As they were speaking, J.D. began ripping his face mask.  *Id.* ¶ 38.  Mr. Lloyd told J.D. to give him the mask.  *Id.* ¶ 39.  When J.D. did not comply, Mr. Davis put his hand on J.D.'s shoulder and Mr. Lloyd grabbed the mask out of J.D.'s hand.  *Id.*  J.D. "instinctively stood up," *id.* ¶ 40, but he did not try to grab the mask back, *id.* ¶ 41.  In response, Mr. Lloyd "reached back and punched J.D. in the face with a closed fist," which broke J.D.'s jaw.  *Id.* ¶¶ 41-42.  J.D. fell backward, hit his head against the wall, and landed on his bed.  *Id.* ¶ 42.

Mr. Lloyd then climbed on top of J.D. and began strangling him, leaving J.D. unable to breathe as blood flowed from his mouth.  *Id.* ¶¶ 43-44.  J.D. tried tapping Mr. Lloyd to get him to stop, but Mr. Lloyd refused to let go.  *Id.* ¶ 44.  Mr. Davis initially did not intervene, but after several seconds, he told Mr. Lloyd, "chill, chill, there's blood."  *Id.* ¶ 46.  Mr. Lloyd stopped strangling J.D.  *Id.*

J.D. felt "searing pain" in his jaw, neck, and head.  *Id.* ¶ 47.  He believed that his jaw was broken and tried to tell Mr. Davis and Mr. Lloyd.  *Id.*  Mr. Davis told J.D. that he was wrong, his

---

[2] Although the complaint is unclear, it appears that once Mr. Davis and Mr. Lloyd arrived, Ms. Hawthorne and Mr. Mason left J.D.'s room.  *See* ECF No. 1 ¶ 27.

jaw was not broken, and he was fine.  *Id.* ¶ 48.  Neither Mr. Davis nor Mr. Lloyd sought medical attention for J.D. as "endless blood" streamed from his mouth and pooled on the floor.  *Id.* ¶¶ 49, 51.  Instead, Mr. Davis "tried to bribe J.D. to be silent"—instructing J.D. that he should "tell the people that [he] hit [his] mouth on the wall," and saying that, if J.D. did so, Mr. Davis and Mr. Lloyd would "take care of [him] for the rest of [his] stay" at the YSC.  *Id.* ¶ 52 (fourth alteration in original).

J.D. reiterated that his jaw was broken, which prompted Mr. Lloyd to tell him to be quiet and ask him how old he was.  *Id.* ¶ 53.  After J.D. responded that he was fourteen years old, Mr. Lloyd stated "you a youngin, I'm sorry."  *Id.*  Mr. Lloyd then promised to give J.D. "snacks" and "phone calls" in exchange for telling medical staff that he had hit his mouth on the wall.  *Id.* J.D. again asked to be taken to the medical unit, and Mr. Davis responded that he would call medical staff to come to J.D.'s room because another resident was in the medical unit.  *Id.* ¶ 54.

During the ten-minute wait for medical staff, Mr. Davis and Mr. Lloyd did not offer aid to J.D. and instead continued to "emphasize[] that J.D. should lie about the incident and how it happened."  *Id.* ¶ 55.  Medical staff arrived to find J.D. covered in blood and bleeding profusely from his mouth.  *Id.* ¶ 56.

J.D. was taken to the emergency room at Children's National Hospital, where scans showed that his jaw was broken in two places.  *Id.* ¶¶ 58-59.  Doctors determined that he needed surgery, admitted him to the hospital, and wired his jaw shut until he could have surgery two days later.  *Id.* ¶¶ 60-61.  While waiting for surgery, J.D. experienced bleeding and headaches.  *Id.* ¶ 62.  J.D. told his mother about the assault, and she alerted the hospital's social services team.  *Id.* ¶ 63.  J.D. then told a hospital psychiatrist that he was "worried" about returning to the YSC and seeing Mr. Lloyd, and the psychiatrist recommended therapy.  *Id.*  On May 9, 2022—four days after the incident and

two days after surgery—the hospital discharged J.D.  *Id.* ¶ 64.  He returned to the YSC and encountered Mr. Davis in the intake unit, "triggering memories of the ordeal and making him fearful."  *Id.* ¶ 65.

Upon returning to the YSC, J.D. spent over two weeks in the medical unit and could not attend school or receive specialized instruction in accordance with his Individualized Education Plan.  *Id.* ¶ 69.  He was on a liquid-only diet and restricted from physical activity for six weeks.  *Id.* ¶ 66.  At a follow-up appointment at Children's National Hospital, a dental surgeon advised J.D. to exercise his jaw, but DYRS staff did not supervise his exercises or otherwise support his recovery.  *Id.* ¶¶ 70-71.

J.D. continues to experience pain stemming from the incident.  *Id.* ¶ 74.  In April 2025, nearly three years after the incident, a dentist at Washington Hospital Center informed J.D. that his jaw is permanently misaligned and he will feel pain and discomfort for the rest of his life.  *Id.* ¶¶ 75-76.  Aside from his physical symptoms, J.D. continues to struggle mentally and emotionally: he feels the need to constantly be alert, feels uncomfortable when people are near him, and suffers from nightmares and insomnia.  *Id.* ¶ 77.

J.D.'s hospitalization triggered an investigation by DYRS's Office of Internal Integrity.  *Id.* ¶¶ 78-79.  According to J.D., the resulting internal report substantiated his account of the incident and revealed efforts by Mr. Lloyd and Mr. Davis to cover up the assault.  *Id.* ¶ 82.  DYRS terminated Mr. Lloyd and Mr. Davis, but it did not report the incident to the District's Office of Independent Juvenile Justice Facilities Oversight, which J.D. believes it was required to do.  *Id.* ¶¶ 83-84.  J.D. was released from DYRS custody on his eighteenth birthday in June 2025.  *See* ECF No. 19, at 1; ECF No. 21-1 ¶ 3.

## II.    PROCEDURAL HISTORY

With the court's permission to proceed using pseudonyms, ECF No. 5, J.D.'s mother, Jane Doe, filed this action on behalf of herself and J.D. in May 2025, ECF No. 1 ¶ 12.  Once J.D. turned eighteen, the court granted Ms. Doe's motion to substitute him as the party in interest.  ECF No. 19; Aug. 6, 2025 Minute Order.  In his ten-count complaint, J.D. advances claims against the District for violations of the Fifth Amendment or the Eighth Amendment, ECF No. 1 ¶¶ 151-162 (Count IV); battery, *id.* ¶¶ 163-167 (Count VI); negligence, *id.* ¶¶ 172-177 (Count VIII); and intentional infliction of emotional distress, *id.* ¶¶ 191-196 (Count IX).  He brings claims against Mr. Lloyd for violations of the Fifth Amendment, *id.* ¶¶ 111-125 (Count I); the Eighth Amendment, *id.* ¶¶ 126-139 (Count II); battery, *id.* ¶¶ 163-167 (Count V); and intentional infliction of emotional distress, *id.* ¶¶ 185-190 (Count X).[3]  And he raises claims against Mr. Davis for violations of the Fifth Amendment, *id.* ¶¶ 111-125 (Count I); the Eighth Amendment, *id.* ¶¶ 140-150 (Count III); and negligence, *id.* ¶¶ 172-177 (Count VII).

After service was effected on each Defendant, the District appeared in the case and filed a partial motion to dismiss.  ECF No. 21.  That motion is fully briefed.  ECF Nos. 21, 33, 35.  Mr. Lloyd and Mr. Davis have failed to appear in the case.[4]  In December 2025, the Clerk of Court entered defaults against them, ECF Nos. 38, 39, and in February 2026, J.D. filed a motion for default judgment, ECF No. 43.

---

[3] The complaint labels the count alleging intentional infliction of emotion distress against Mr. Lloyd as a second Count VIII, so the court has renumbered it as Count X.  *See* ECF No. 1 ¶¶ 178-190.

[4] In June 2025, Mr. Davis sought an extension of time to respond to the complaint because he was seeking to retain counsel, ECF No. 18, but he subsequently failed to appear in the case either through counsel or pro se.

### III.     LEGAL STANDARD

Under Rule 12(b)(6), the court will dismiss a complaint that does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  In evaluating a motion under Rule 12(b)(6), a court accepts all well-pleaded factual allegations in the complaint as true.  *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *see also Atherton v. D.C. Off. of Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009).  Although the plausibility standard does not require "detailed factual allegations," it "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555.  Nor will "'naked assertion[s]' devoid of 'further factual enhancement'" suffice.  *Iqbal*, 556 U.S. at 678 (alteration in original) (quoting *Twombly*, 550 U.S. at 557).

### IV.     DISCUSSION

When the District filed its partial motion to dismiss, it disputed J.D.'s claims for injunctive and declaratory relief and his attempt to proceed under both the Fifth and Eighth Amendments in Count IV, in which J.D. alleges that the District has a policy or custom of allowing DYRS to use excessive force against those in its custody.  ECF No. 21, at 5-9; *see* ECF No. 1 ¶ 154.  On the issue of remedies, the District argued that J.D. lacked standing to seek injunctive and declaratory relief (or, alternatively, that his claims were moot) because he had been released from DYRS custody on his eighteenth birthday and, as an adult, he can never again be committed to DYRS.  ECF No. 21, at 5-7.  In response, J.D. conceded that his claims for injunctive and prospective declaratory relief are moot, but he argued that he had standing to seek a retrospective declaration

that the District had violated his rights.  ECF No. 33, at 1-3 & n.3.  In its reply, the District clarified

that it does not challenge J.D.'s request for retrospective declaratory relief.  ECF No. 35, at 1 n.1.

Accordingly, and with the parties' agreement, the court dismisses J.D.'s claims for injunctive and

prospective declaratory relief and allows his claim for retrospective declaratory relief to proceed.

The District and J.D. continue to disagree over two related issues: first, whether Count IV

is properly brought under the Fifth Amendment or the Eighth Amendment; and second, whether

J.D. may—at this early stage in the litigation—proceed to discovery on both theories.[5]  In the

District's view, the Eighth Amendment squarely governs Count IV, and J.D.'s Fifth Amendment

claim must be dismissed for failure to state a claim.  ECF No. 21, at 7-9; ECF No. 35, at 2-5.  While

J.D. concedes that he may eventually prevail on Count IV under only one constitutional theory,

ECF No. 33, at 2, he maintains that at this juncture he may plead the Fifth and Eighth Amendments

in the alternative and proceed to discovery on both, *id.* at 9-11.[6]  The court agrees with J.D.;

---

[5] The applicable amendment affects the standard for reviewing the substance of J.D.'s claim that the District has a policy or custom of allowing DYRS staff to use excessive force.  "[T]o state a claim of excessive use of force" under the Eighth Amendment, "the prisoner must prove that a government official acted '"maliciously and sadistically for the very purpose of causing harm,"' and that the consequent injury was more than *de minimis*."  *Chandler v. District of Columbia*, 145 F.3d 1355, 1360 (D.C. Cir. 1998) (citation omitted) (quoting *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986)).  "Courts considering such claims must make an objective inquiry to determine whether the alleged wrongdoing is sufficiently harmful to establish a constitutional violation, and a subjective inquiry[] regarding the prison official's state of mind."  *Thomas v. District of Columbia*, 887 F. Supp. 1, 4 (D.D.C. 1995).  Claims involving excessive force under the Due Process Clauses of the Fifth and Fourteenth Amendments are typically subjected to a lower, more plaintiff-friendly standard.  For example, a pretrial detainee alleging excessive force "must show only that the force purposely or knowingly used against him was objectively unreasonable."  *Kingsley v. Hendrickson*, 576 U.S. 389, 396-97 (2015).  That is because "pretrial detainees (unlike convicted prisoners) cannot be punished at all, much less 'maliciously and sadistically.'"  *Id.* at 400-01 (quoting *Ingraham v. Wright*, 430 U.S. 651, 671-72 n.40 (1977)).

[6] J.D. additionally argues that if the court limits Count IV at this stage, it should allow him to proceed under the Fifth Amendment rather than the Eighth Amendment.  ECF No. 33, at 11-22.

accordingly, it denies the District's partial motion to dismiss the Fifth Amendment claim in Count IV.

The Eighth Amendment prohibits the government from requiring "[e]xcessive bail," imposing "excessive fines," and, relevant here, inflicting "cruel and unusual punishments." U.S. Const. amend. VIII.  In contrast, the Fifth Amendment's Due Process Clause guarantees that no person shall "be deprived of life, liberty, or property[] without due process of law," U.S. Const. amend. V, and it contains a "substantive component . . . that protects individual liberty against 'certain government actions regardless of the fairness of the procedures used to implement them,'" *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992) (quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986)).  "Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing the[] claims." *County of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998) (quoting *Albright v. Oliver*, 510 U.S. 266, 273 (1994)).  At the same time, "Federal Rule of Civil Procedure 8(d)(2) affords a party considerable flexibility in framing a pleading by expressly permitting claims for relief . . . to be set forth in an alternative . . . manner."  5 Charles Alan Wright et al., *Federal Practice and Procedure* § 1282 (4th ed. 2025).  Because the District argues that J.D. may proceed on Count IV only under the Eighth Amendment, the question for the court is whether the Eighth Amendment *explicitly* protects J.D. from the District's alleged policy or custom of allowing DYRS staff to use excessive force.  *See* ECF No. 1 ¶ 154.  The Eighth Amendment would be the sole "guide for analyzing" that claim only if it offers such explicit protection.  *Lewis*, 523 U.S. at 842.

The court concludes that the Eighth Amendment does not provide an explicit textual source of constitutional protection for J.D. because the relevant part of the Eighth Amendment is

concerned with "cruel and unusual *punishments*," U.S. Const. amend. VIII (emphasis added), and juveniles who are adjudicated delinquent are not punished but instead receive "care" and "rehabilitation," D.C. Code § 16-2301(6).  In other words, because the District's juvenile justice system is not punitive, the consequences stemming from an adjudication of juvenile delinquency are not explicitly subjected to the Eighth Amendment's requirements.

In arguing otherwise, the District ignores the stated goals of the juvenile justice system and focuses narrowly on how the process of adjudicating a juvenile to be delinquent "parallels the criminal system" for adults.  ECF No. 35, at 8; *see* ECF No. 21, at 7-9.  In the District's view, the Eighth Amendment attaches after an "adjudication following a proceeding that adheres to manifold procedural safeguards," ECF No. 35, at 6, regardless of whether the consequences following that adjudication are punitive or not.  That argument is wrong as a matter of fact because juvenile delinquency proceedings lack several critical procedural safeguards available in adult criminal proceedings, and it is wrong as a matter of law because the Eighth Amendment fundamentally concerns punishment, rather than guaranteeing process.

### A.    The District's Juvenile Justice System Is Not Punitive

"The Eighth Amendment does not outlaw cruel and unusual 'conditions,'" only "cruel and unusual 'punishments.'"  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  The prohibition on cruel and unusual punishment "is specifically concerned with the unnecessary and wanton infliction of pain in *penal* institutions," and it thus "serves as the primary source of substantive protection to convicted prisoners" challenging "the deliberate use of force . . . as excessive and unjustified."  *Whitley v. Albers*, 475 U.S. 312, 327 (1986) (emphasis added).  Put differently, the Eighth Amendment is implicated when a court "evaluate[s] *penal* measures."  *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (emphasis added).  Against this metric, the Eighth Amendment does not explicitly

protect J.D. if the District was not "punishing [him] by incarceration" when it committed him to DYRS custody. *Id.* at 103.

The most cursory review of the District's juvenile justice system demonstrates that it is not concerned with punishment, but instead with providing care and rehabilitation. To begin, District law defines a "delinquent child" to be "a child who has committed a delinquent act *and is in need of care or rehabilitation*." D.C. Code § 16-2301(6) (emphasis added). An adjudication of juvenile delinquency "is not a conviction of crime," *id.* § 16-2318, and juvenile delinquency proceedings are held in the Family Division of the Superior Court, not the court's Criminal Division, *compare id.* § 16-2301(1) (clarifying that the "Division" for delinquency proceedings is the "Family Division of the Superior Court"), *and id.* § 16-2317 (explaining that the "Division" conducts factfinding and dispositional hearings in delinquency cases), *with id.* §§ 16-701 to 16-714 (providing for criminal proceedings in the Superior Court's Criminal Division).[7] Perhaps most critically, "[n]o child who is found to be delinquent . . . shall be committed to a penal or correctional institution for adult offenders." *Id.* § 16-2320(e). Instead, if a judge in the Family Division determines that the "allegations in a delinquency petition have been established by proof beyond a reasonable doubt," the judge "shall proceed to hold a dispositional hearing." *Id.* § 16-2317(c). At that hearing, the judge considers whether there is a "need for care or rehabilitation"—not punishment. *Id.*; *see id.* § 16-2317(d)(2).[8] The judge has a range of options for disposition, the most severe of which is committing the child to the custody of DYRS. *Id.*

---

[7] The District argues that it merely "exercises its discretion to avoid the term 'conviction,'" ECF No. 35, at 7, but this misses the fundamental point that an adjudication of juvenile delinquency does not operate like an adult criminal conviction, D.C. Code § 16-2318.

[8] In contrast, after a criminal adjudication for a felony offense, the Superior Court must impose a sentence that "[p]rovides for just punishment and affords adequate deterrence to potential criminal conduct of the offender and others." D.C. Code § 24-403.01(a)(2).

§ 16-2320(c).   When a child is committed to DYRS custody, DYRS must develop an "individualized rehabilitation plan for the child."   *Id.* § 16-2319(d)(1)(C); *see id.* § 16-2319(d)(2)(C).   After assuming custody of the child, DYRS is "vest[ed]" with legal "responsibility" for the child, including "the right and duty to protect, train, and discipline [him]." *Id.* § 16-2301(21)(B); *see id.* § 2-1510.01(5)(A)(ii).   As part of this responsibility, DYRS is required by law to "implement the [child's] individualized rehabilitation plan."  *Id.* § 16-2319(f).

The District's creation of a legal regime for delinquency adjudications that stands wholly apart from the criminal process is not an act of administrative grace.  The District has "accept[ed] [that its] juvenile courts [are] distinct from the adult criminal justice system, [which] assumes that juvenile offenders constitutionally may be treated differently from adults."  *Bellotti v. Baird*, 443 U.S. 622, 635 (1979).  Indeed, the District has a mechanism for prosecuting children as adults when certain criteria are met.  D.C. Code § 16-2307(a).  Specifically, if a "child was fifteen or more years of age at the time of the conduct charged[] and is alleged to have committed an act which would constitute a felony if committed by an adult," the Attorney General for the District of Columbia may seek "transfer of the child for criminal prosecution" by the U.S. Attorney's Office for the District of Columbia.  *Id.*  The Family Division judge considering the District's motion must transfer the case to the Criminal Division if doing so "is in the interest of the public welfare and protection of the public security and there are no reasonable prospects for rehabilitation of the child."  *Id.* § 16-2307(d)(2)(A).  Only after the case is transferred to the Criminal Division may the U.S. Attorney's Office proceed with criminal charges, seek a criminal conviction, and request imposition of a criminal sentence.  But juveniles who remain in the Family Division are beyond the reach of the District's criminal-law apparatus.

12

The District does not seriously contend that its juvenile justice system is focused on punishment rather than care and rehabilitation. The strongest arguments the District offers are that DYRS has the authority to "discipline" juveniles in its custody, ECF No. 21, at 9 (quoting D.C. Code § 16-2301(21)(b)), and that the District's Department of Corrections, which holds adult offenders at the D.C. Jail, also focuses on providing inmates with "proper treatment, care, rehabilitation, and reformation," D.C. Code § 24-211.02(a); *see* ECF No. 35, at 7. The court does not doubt that DYRS and the Department of Corrections may share some similar responsibilities and goals despite the different populations in their custody. But the fact that DYRS has the authority to discipline juveniles in its custody does not mean that the discipline it imposes is the same as that dispensed by the Department of Corrections, just as the Department of Corrections' consideration of adult inmates' rehabilitation does not render the D.C. Jail a non-penal institution. Instead, what matters for Eighth Amendment purposes is that the District's juvenile justice system "place[s] a premium on the rehabilitation of children with the goal of creating productive citizens." D.C. Code § 16-2301.02(5). The system's simultaneous concerns "for the safety of the public," *id.* § 16-2301.02(8), and "hold[ing] a child found to be delinquent accountable for his . . . actions," *id.* § 16-2301.02(4), do not disturb the fundamental distinction that the District has drawn between DYRS custody and "penal or correctional institutions," *id.* § 16-2320(e). Only in DYRS custody is the District primarily focused on "care or rehabilitation," *id.* § 16-2317(d)—by "implement[ing] [the child's] individualized rehabilitation plan," *id.* § 16-2319(f)—rather than carrying out whatever criminal sentence constitutes "just punishment," *id.* § 24-403.01(a)(2). At bottom, a juvenile's commitment to DYRS custody is not punishment within the meaning of the Eighth Amendment.

**B.    Delinquency Adjudications in the District Lack Important Procedural Protections**

Rather than dispute the non-penal nature of the District's juvenile justice system, the District focuses on the ways in which the procedural safeguards provided to juveniles in delinquency proceedings are similar to those afforded to adults in criminal proceedings. The District's argument starts from the uncontested observation that the Eighth Amendment governs the punishment imposed on an adult following a criminal conviction. The District then asserts that the Eighth Amendment applies with equal force to the consequences imposed on a juvenile who has been adjudicated delinquent *solely* because the process for securing a delinquency adjudication mirrors that for securing a criminal conviction. *See* ECF No. 21, at 8-9; *see also* ECF No. 35, at 6-7. The court disagrees.

To be sure, District law grants a juvenile in delinquency proceedings several important protections that are available to adults in the criminal system. He has a constitutional and statutory right to an attorney—including appointed counsel if he cannot afford one. *In re R.K.S.*, 905 A.2d 201, 209 (D.C. 2006); *In re Gault*, 387 U.S. 1, 36, 41 (1967); D.C. Code § 16-2304(a). He enjoys the privilege against self-incrimination. *In re Gault*, 387 U.S. at 47-50; *see In re Winship*, 397 U.S. 358, 368 (1970). He is also entitled, as a matter of due process, to adequate notice of the charges against him, *In re Gault*, 387 U.S. at 31-34, and to confront witnesses against him, *In re J.W.*, 258 A.3d 195, 201 (D.C. 2021). And, after a hearing, he may be adjudicated delinquent only if the District proves the allegations beyond a reasonable doubt. D.C. Code §§ 16-2316, 16-2317. The Supreme Court has recognized that juvenile delinquency proceedings "must measure up to the essentials of due process and fair treatment," *In re Gault*, 387 U.S. at 30, which the District ensures through these protections.

But juveniles do not receive at least two foundational protections that are hallmarks of adult criminal proceedings: the right to a public trial by a jury of peers. The Sixth Amendment promises that "'[i]n all criminal prosecutions the accused' has 'the right to a speedy and public trial, by an impartial jury.'" *Erlinger v. United States*, 602 U.S. 821, 830 (2024) (alteration in original) (quoting U.S. Const. amend. VI). Both the Fifth and Sixth Amendments "placed the jury at the heart of our criminal justice system." *Id.* at 831. And, as relevant here, the "Fifth and Sixth Amendments sought to ensure that a judge's power to punish would 'deriv[e] wholly' from, and remain always 'control[led]' by, the jury and its verdict." *Id.* (alterations in original) (quoting *Blakely v. Washington*, 542 U.S. 296, 306 (2004)). The jury function is "no mere procedural formality, but a fundamental reservation of power in our constitutional structure." *Blakely*, 542 U.S. at 305-06. "By requiring a unanimous jury to find every fact essential to an offender's punishment, [the Fifth and Sixth Amendments] similarly seek to constrain the Judicial Branch, ensuring that the punishments courts issue are not the result of a judicial 'inquisition' but are premised on laws adopted by the people's elected representatives and facts found by members of the community." *Erlinger*, 602 U.S. at 832 (quoting *Blakely*, 542 U.S. at 307).

Despite the jury's crucial role in legitimizing the court's imposition of punishment—which triggers the Eighth Amendment's application—the Supreme Court has concluded that "trial by jury in the juvenile court's adjudicative stage is not a constitutional requirement." *McKeiver v. Pennsylvania*, 403 U.S. 528, 545 (1971). The Court reasoned that requiring jury verdicts "w[ould] remake the juvenile proceeding into a fully adversar[ial] process and w[ould] put an effective end to what has been the idealistic prospect of an intimate, informal protective proceeding." *Id*. Consistent with *McKeiver*, the District prohibits public jury trials in juvenile delinquency cases. D.C. Code § 16-2316(e)(2). The District's decision to forgo juries in these cases reflects its ability

15

"to adjust its legal system to account for children's vulnerability and their needs for 'concern, . . . sympathy, and . . . paternal attention.'" *Baird*, 443 U.S. at 635 (alterations in original) (quoting *McKeiver*, 403 U.S. at 550). Because juveniles in delinquency proceedings do not receive a component of constitutional criminal procedure that plays an important role in justifying post-conviction punishment, the court is not persuaded by the District's insistence that its juvenile delinquency and criminal systems afford sufficiently similar procedural protections.[9]

Aside from resting on an incomplete factual premise, the District's argument relies on a mistaken legal assumption—that the Eighth Amendment is concerned only with the manner of adjudication, rather than the punitive nature of a penal sentence. If the District were correct, then the Eighth Amendment would apply to every consequence that flows from an adult criminal conviction. But the "mere fact that a criminal conviction triggers a consequence has never been the operative test to determine whether that consequence is punitive or otherwise implicates the cruel and unusual punishment clause." *Hinds v. Lynch*, 790 F.3d 259, 265 (1st Cir. 2015). Courts have therefore determined that certain consequences—among them deportation and a deprivation of the right to vote—are *not* Eighth Amendment punishments. *See Ingraham v. Wright*, 430 U.S. 651, 668 (1977) ("[D]eportation is not a punishment for crime." (quoting *Fong Yue Ting v. United States*, 149 U.S. 698, 730 (1893))); *Hopkins v. Watson*, 108 F.4th 371, 382-83 (5th Cir. 2024) (en

---

[9] In *Ingraham*, 430 U.S. at 699 n.37, the Supreme Court observed that "[s]ome punishments . . . may be sufficiently analogous to criminal punishments in the circumstances in which they are administered" and noted the open question "whether or under what circumstances persons involuntarily confined in . . . juvenile institutions can claim the protection of the Eighth Amendment." Notwithstanding the Court's dicta about juvenile justice systems generally, the circumstances surrounding the District's scheme—an absence of specific procedural protections necessary to justify imposing a penal sentence, the Family Division judge's focus on a child's need for care and rehabilitation, and DYRS's responsibility for implementing the child's individualized rehabilitation plan—warrant the conclusion that the commitment of a juvenile to DYRS custody is not punishment for Eighth Amendment purposes.

banc) ("[F]elon disenfranchisement is not a punishment, much less cruel or unusual."); *cf. Hudson v. United States*, 522 U.S. 93, 104 (1997) (stating in the Fifth Amendment double-jeopardy context that "neither money penalties nor [occupational] debarment has historically been viewed as punishment" because both lack "'the punitive criminal element'" (quoting *Helvering v. Mitchell*, 303 U.S. 391, 399 (1938))); *Simmons v. Galvin*, 575 F.3d 24, 44-45 (1st Cir. 2009) (noting in an analysis under the Ex Post Facto Clause that a state law disenfranchising felons was not punitive). *But see Jones v. Governor of Fla.*, 950 F.3d 795, 819 (11th Cir.) ("Disenfranchisement is punishment."), *rev'd on other grounds*, 975 F.3d 1016 (11th Cir. 2020) (en banc); *Muntaqim v. Coombe*, 366 F.3d 102, 123 (2d Cir. 2004) ("[T]here is a longstanding practice . . . of disenfranchising felons as a form of punishment."), *vacated on other grounds*, 449 F.3d 371 (2d Cir. 2006). Accordingly, the District's argument is inherently flawed, and the observation that a juvenile's commitment to DYRS custody follows a delinquency adjudication cannot, on its own, prove that the Eighth Amendment applies.

* * *

J.D. was not in DYRS's custody to be punished; he was there to receive care and rehabilitation. Because the Eighth Amendment is concerned with punishment and not care and rehabilitation, it does not "provide[] an *explicit* textual source of constitutional protection against [the] particular sort of government behavior" that would foreclose J.D. from alternatively proceeding on Count IV under the Fifth Amendment. *Lewis*, 523 U.S. at 842 (emphasis added); *see Jackson v. Johnson*, 118 F. Supp. 2d 278, 286-87 (N.D.N.Y. 2000) (holding that the Fourteenth

17

Amendment, rather than the Eighth Amendment, applied to a juvenile's constitutional claims).[10]

Accordingly, the court denies the District's partial motion to dismiss J.D.'s Fifth Amendment claim in Count IV.

### V.    CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that the District of Columbia's Partial Motion to Dismiss, ECF No. 21, is **GRANTED** as it concerns J.D.'s claims for injunctive and prospective declaratory relief and **DENIED** as it concerns J.D.'s Fifth Amendment claim in Count IV.  It is further **ORDERED** that the District of Columbia shall file its answer to J.D.'s complaint, ECF No. 1, on or before March 31, 2026.  Fed. R. Civ. P. 12(a)(4)(A).

**SO ORDERED.**

_____
LOREN L. ALIKHAN
United States District Judge

Date:   March 17, 2026

---

[10] The Fourteenth Amendment does not apply to the District of Columbia.  *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954).  Instead, the District is "subject to the [due process] restrictions of the Fifth Amendment."  *Propert v. District of Columbia*, 948 F.2d 1327, 1330 n.5 (D.C. Cir. 1991); *see Matthews v. District of Columbia*, 507 F. Supp. 3d 203, 210 (D.D.C. 2020).